without your argument in appeal number 2006 1 3 8 5 Good afternoon, your honors. Cameron Rosen for the attellants, with me is Jack Blumenfeld of the Morris, Arce, Nicholson, Tonello law firm, may it please the court, district court's inequitable conduct determination rests upon a misapprehension of law, it erred in holding that software developed internally by the plaintiffs for performing automated trading was disclosed and therefore highly material prior art without regard to whether it was ever used or activated. Counsel, I'm glad you started with this because this is the point that I really want to know and I'll tell you I spent some time going through your source code which isn't a lot of fun but what I'm trying to figure out specifically is the portion of the code that contradicts your statements about Wagner in the prior art in the prosecution history where the portions of your code that contradict that statement about trade states, the portions that were not called, you clearly have in your source code portions that were not called and not callable it seems but rather what we would call latent code and so my question to you is are the portions of that latent code that weren't called in the commercial use of the product more than a year before the filing date, are those the portions that pertain to why you should have disclosed this to the PTO? Your Honor, at the first part of the question I think you asked about whether this was the code that contradicted what we said about Wagner and I just want to make it clear that the finding of the district court was not I think that this contradicted Wagner but in fact that we made statements that there were no trading states in the prior art but in fact there were trading states in our own product. That's right. I think this was a part of Wagner. Now with respect to your question. Well it was relevant to the rejection in light of Wagner that you made these responsive statements that there's nothing in the prior art that shows trade states, i.e. Wagner doesn't disclose them and there's nothing else whereas your own system did so I'm trying to figure out, you argue very clearly in the briefs that there are portions of the code that aren't called and aren't being used. Correct Your Honor. So what I'm trying to figure out is are those the portions that are relevant to the trade states because it seems to me that the portions are relevant to the new rules application but that the trade states were part of both the old and the new rules and therefore were called as part of the use of that subroutine and source code. Thank you for clarifying the question Your Honor. The trade states, it may just give a little bit of history. The super system as originally rolled out in production included software code for certain trade states which implement would be for the purpose of implementing automated trading. That code was not called because the district court found the system was not used for automated trading. That's number one. Later, as part of subsequent development, looking towards a later system, additional code, I should say the code was modified to include code for the so-called new rules. But don't the old rules have trade states too? This is where I'm getting a little confused from a technological standpoint. The original code had trade states. Long before, a year before or so, the new rules code was entered. However, that system was not used in a way that implemented those trade states. This is the distinction between trade capture and automated trading which at the trial of this case was, and in the record now before you, one of the major issues. Did the software call the subroutines to pertain to trade states? No. It didn't? Because I did see at one point an argument in the brief where you said something about how, or someone said something about how the traders didn't pay attention to those things. Well, that's different from whether the subroutine was run or not. That comment was, I think it was a finding of the district court, that the interface of the system was so complicated, traders simply didn't want to deal with the system at all. So here's my question. Why then have you not argued our line of cases that talk about latent code? And in particular, we have fantasy football. We've got all these cases that talk about if a piece of software has a section of code which is not capable of being run, not being run, then that software does not infringe. Well, if it doesn't infringe, it doesn't anticipate. So why aren't you arguing you never had to disclose this to us to begin with? Disclose it to the PTO to begin with. That it's not prior art with regard to the portions of the code that weren't run. It's only prior art with regard to the portions that were. Why is that argument nowhere in here? Your Honor, if that argument isn't coming through, I apologize. Not one of the cases on that point are cited. Those cases are not cited. But certainly our argument is that that code was not prior art that could negate the novelty of the invention as later claimed. Well, the super system certainly is prior art. But I'm worried about which portions of the super system code are. The automated trading software component was not prior art that could be cited against our later patent applications. And why is that? I'm sorry? And why is that? Because it was never run? Because it was never used. But the record is sort of unclear about that in the sense that apparently it was abandoned because it didn't work. Doesn't that suggest that it must have been run at some point? Well, the evidence was that it was tested and found. The system was found not to be robust enough to be used commercially. I guess the question is tested how? Tested in a commercial environment or a non-commercial environment? The automated trading testing was a non-commercial type laboratory environment. How do I tell that from this record? Your Honor, the district court found, and the citations are in our brief, that the system was never used for automated trading. But what I'm looking for is a cite to the record. Somebody's testimony, and I've read the affidavits that were submitted to the PTO, somebody's testimony that this was never used in a commercial environment and that the testing that was done was in a non-commercial environment. And I've read your briefs twice. I don't see a citation to that. Is there such testimony in the record? It may be a case, Your Honor, of the language and the jargon of the witnesses being used here saying that but not conveying it to Your Honor. When these witnesses say that. Well, what are you relying on? Show me what you're relying on. Your Honor, the district court in particular cited the testimony of the defense witness, Marshall Caron, who testified that all trading done during his reign was voice brokered, that everything was done by orally conducting trades and then contemporaneously entering that data into the system, which was the trade capture function. I think the district court relied upon that particular piece of testimony because it was from the defense side. The witnesses in our case in chief, Lutnick, Paul, and Ginsberg, all testified to that as well. But where do I find the testimony that the testing that was done here was in a non-commercial environment? Because if it was tested in a commercial environment, you've got a problem because even if it were experimental use in that context, it probably would have to be disclosed. Your Honor, I think the answer is that the defendants never relied upon the testing as constituting the commercial use, so you don't have that particular testimony. The theory of the case that the defendants always presented was that the actual rollout of the system into the bills and Canadians rooms referred to in the record was the commercial use. And the defense theory was there is no distinction between trade capture and automated trading. So I think the reason why Your Honor might not find the statement that the testing of 6 to 18 transactions per second was not commercial is that really would have been the defendants' burden to put in evidence that it was commercial. So the answer is there's no testimony in this record one way or the other as to whether the testing was done in a commercial or non-commercial environment. I think that's right, Your Honor. And I think the burden to present that testimony that it was commercial would have been on the defendants, and I think that's why it's missing because that was never their theory of why this thing should be disclosed. Mr. Rosen, you argued that the automated trading capability was never used, and I'm a little confused as to whether when you say it was never used, it's never used simply because it was not seen to be practical, it wasn't effective, it wasn't efficient, or that it wasn't used because it was disabled or not enabled or it was simply resident as subroutines that were not ready to be called up. Can you clarify that for me, please? Your Honor, the testimony of record was, I would say the code was bypassed, that there were other commands that were created. But the capability was there. The record would support that the code was in the system being commercially used for another purpose, that somebody entering the commands to invoke that code would have succeeded in invoking that code. But there is no testimony that that was done, again, because the system was found simply not to be robust enough to perform those functions in an actual commercial setting. The reason I ask is I'm just wondering how this relates to this question of whether it was in public use or not. Take a hypothetical of, for example, a claim covering an automobile with an air conditioning system, and you have automobiles that were built with air conditioners and they were sent to potential dealers, and all the dealers happened to be located in Maine, and it was the middle of the winter, and nobody ever turned the air conditioner on for a year. Would you say under those circumstances the automobile with air conditioning capability was not in public use or was in public use? Your Honor, I think in that hypothetical, it's probably in the prior art as on sale or publicly known. I think if the facts were changed and the auto manufacturer, for their own use within the factory, developed a vehicle and put in that vehicle a novel air conditioning system so that the laborers in the factory would be comfortable. But never turned it on? But never turned it on. Then I don't think you'd have an on sale situation. I don't think you'd have a public knowledge situation, and I don't think you'd have a public use situation either. So in my understanding from a technology standpoint, the code would not have to be altered in order to run the system. It just would have had to have been commands entered in at the keyboard by the user that would have called up those subroutines. I think it's correct that users in those commercial rooms could have called up those routines, whether the system was actually operative to do that in the sense that the testimony was pretty clear that it simply didn't have the architecture and the hardware was simply not robust enough to actually make that happen for any commercial purpose. So could the commands be invoked? I believe so. Could it actually have been used commercially? I think the record supports and the district court supports the finding that no, the system was too slow to be operative for that purpose. Mr. Rosen, you're into your rebuttal, but Judge Dyke has a question. This is on another subject, and that is the privilege issue. When this document with the marginalia by the attorney was turned over, was there any objection with respect to the disclosure of that particular document, or was that just turned over pursuant to the general direction to turn over documents having to do with the super system or whatever it's called? That particular document was reviewed in camera by the district court and specifically ordered produced. Did you ever argue to the district court that it shouldn't be produced because it didn't relate to the inequitable conduct issue but only to written description? No, I don't think we made that argument, Your Honor. We made, as you might have seen in the record, the court said that these documents had to be pried from our clutches. We fought the turnover of those documents very hard. But to answer your particular question, I doubt at that stage, which was somewhere mid-discovery, we would have even been in the position to say that's only written description, it's not inequitable conduct. But it was a document specifically ordered produced by the district court by page number. I don't know if that order is in the appendix because that just wasn't an issue raised in the briefing, but the court ordered it by very specifically produced. Okay, thank you. We've used up your time with our questions, so we'll restore your four minutes of rebuttal. Thank you very much. Now we'll hear from Mr. Jakes. Yes, good afternoon, Your Honors. Mike Jakes from Finnegan-Henderson here on behalf of the defendants. I'd like to start out by reminding the court that there are a number of issues in this case. There are two separate findings of inequitable conduct. There's a jury verdict that the claims were invalid, and unless the plaintiffs were successful on all three of those issues, we don't even get to the claim construction and prosecution history of the Stavel issues. Counsel, would you mind focusing in on my technological point? I really want to know. I'm trying to understand whether this is a latent code case, like Fantasy Football, Telemac, Intel, all those lines of cases where in the infringement context we said if there are subroutines in software but they're not callable, they're not capable of being called in the average use of the software, then that software doesn't infringe, even though the subroutine is there. So I'm trying to sort of analogize that to the anticipation context, i.e., the public use. So tell me what I want to hear about this specifically with regard to the technology. Are those subroutines that are called or not callable, are those the ones relevant to the trade states? The record shows that the trade states were used during the open outcry trade entry system use of the super system. And I can point you to a couple of places of testimony in the record. One of them is Mr. Caro's testimony on page 3086, where he says the system was rolled out into the Bills and Canadian Room and it was used to perform the trading logic. That means the trading states. There's also Mr. Agarwala's testimony at 3300, which is also cited by the district court at page 818, where he specifically says the super system entered into a workup state. Now, the plaintiffs have drawn this distinction between an automated trading system and a system that was used for trade entry or trade capture. But I remind the court that they told the patent office when they were prosecuting the application that the system covered an open outcry system that was facilitated by trade capture. Well, suppose we disagree with that. Let's hypothetically say we reject that and that the inequitable conduct here had to be using a system for automated trading, even as an experiment, and not disclosing it to the PTO. Is there any evidence in this record that they used for commercial purposes under this, you know, you're familiar with our recent decision in Plumtree, that they used for commercial purposes, that they performed the steps of this method of patent? Stop right there. It's not a method patent. Original application claims were to a system. And so I would agree that a method of use... Well, the 580 is a method patent. A method of use might be different. The 580, but we're talking about failure to disclose the super system in the 974 patent. But the question is, when you're dealing with prior art, is whether there was potential anticipation of the 580 claims themselves, which are method claims, right? That would be true, Your Honor, except the inequitable conduct we're talking about with regard to the super system was with the other patent, with the 974 patent. It was not in connection with the later patent, except to the degree that it affected it. And also there was a failure to disclose it adequately to cure the problem, as well as the false declarations. So the original inequitable conduct, the failure to disclose the super system, was in the 974 patent that had apparatus claims. Counsel, I'm looking now at the district court opinion. See, this is what has bothered me. On page 823 of the blue appendix, the district court says these states were described in a document. He's talking about the super system. And then he says, whether used or not, they were part of a system that was operating in two Cantor Fitzgerald's trading rooms. And that's what really concerns me, is that in two separate places in his opinion, he specifically doesn't find that they were in fact used, but says they were part of a system, whether used or not. And I just, you know, along that fantasy football line of cases, it seems to matter whether they were capable of being called or not capable of being called. Did the code require modification for them to be used? Or were they there? Because, you know, look, if a tree falls in the woods and no one's there to hear it make a sound, it's still a public use as far as I'm concerned. So, you know, if they're there and they could have been called and it just so happens nobody called them, then I don't think this latent software line of cases helps them. But if they weren't callable, because they were truly latent software, then it does matter. And the district court specifically in two places referred to whether used or not. And that part bothers me. Let me answer that in a couple of ways. One, we're talking about materiality as opposed to whether or not something is prior art and anticipatory. And there may be a duty to disclose the system whether or not it ever became prior art. And I think that's what Judge Jordan was saying when he was saying whether or not it was used. Because it was material. Even the plaintiffs agree that it was material. Well, how can we not understand that? I don't agree. First off, I don't think they agree it was material. Maybe I'm speaking for them, and I'll give them a chance in rebuttal to say that. But I don't think they agree it was material. But apart from that... In their brief at page 27, they concede that it was material under the reasonable examiner standard. They just contest whether or not it was highly material, which really goes to the balancing and the judge's abuse of discretion in this case. But for it to be material prior art, it would have to have been used for commercial purposes, right? That's right. Right? The system was used for commercial purposes. Well, the system was used for commercial purposes insofar as it recorded trades. But there seems to be no evidence that it was used for commercial purposes insofar as it provided for automated trading, correct? Well, Your Honor, I'm not sure that that's exactly clear from the record. I did cite the testimony from Mr. Carrow, who says the system was used in the Bills and Canadians room and it performed trading logic. And that means trading states. But I don't see that there's any testimony here. In fact, the district court found specifically that it wasn't used for automated trading. Yes. So if the question is automated trading, it wasn't used, there's no evidence that it was used for automated trading. That's true. But you're equating trading states with automated trading. You can have trading states, according to their statement to the patent office, without having automated trading. Didn't the district court equate trading states with automated trading? In the later patent. And construing the term states in the 5A patent, you did say it was an automated trading system. But we were talking about automated trading systems. There really wasn't an issue. So it wasn't something that was widely discussed or necessary to discuss. And it's not clear that the court would have interpreted the claims the same way in the earlier patent, where the patent office gives it its broadest reasonable interpretation, which you think would be consistent with the plaintiff's statements to the patent office, that this system could be used to facilitate open-ended trade, including having trading states. Now, as whether or not this was a latent code that was not callable, what I can say is that the testimony and what the judge found was that there was a go-around command, that the brokers could avoid using the system as a fully automated trading system by using something they call a go-around command. To me, that's like pushing a function key, and maybe they pushed one and not the other. But the system was there. A broker could have accessed it the way it was written. It didn't require additional programming. That is apparently the case, yes, because of the go-around command. There's nothing that says that the code was ever changed in order to implement automated trading. But your problem is that there isn't any evidence that the code was actually used for commercial purposes. Well, Your Honor, I'll cite the same testimony I've referred you to, where Mr. Carroll said it entered into the trading logic states, and also Mr. Avala's testimony, that it says that the system entered into a work-up state. That's it? I think that's really enough. Mr. Jakes, let me ask you a question on a slightly different subject, and that goes to the discovery question and the waiver. As I understand Judge Jordan's opinion, he found that discovery should be permitted, and there was a waiver of privilege based on some statements in the record, in particular some declarations made by the inventors. And the one that seems to get most attention is paragraph 20 of the B. Joy Paul Declaration. And that paragraph says, it did not occur to me to disclose the super system to the patent office in connection with the application that issued as the 974 patent, because it did not occur to me that the super system, which was an internal CFS system I did not believe was used successfully, could be considered to be prior art to that application. And it goes on to recite a few other things. Where in that statement is there anything at all that implicates attorney-client advice? Your Honor, I think that Judge Jordan, in looking at this, found that that statement was intended to convey their understanding of the law. Where do you find that? Well, use the word prior art. They said we didn't think it was prior art. You mean every time an inventor in a declaration to the patent office says, I don't think that's prior art, that's a waiver of privilege? No, I wouldn't go that far, Your Honor. I would say when the inventor is told by counsel, and it's apparent that they got their understanding from counsel, in this particular situation, where they're making an exculpatory declaration, this is not a routine declaration. This is something where they're coming into the patent office saying, look, here's what we thought. I can understand. You just said a moment ago, when the inventor was told by counsel that you have to make a statement or you have to say something in order to purge the record here, that's fine, but I don't see anything, any place either in this declaration or any place else to suggest that Mr. Paul was told by counsel to say this. I think the judge found that there was an implied understanding that this was based on his understanding of the law when he said, I didn't think it was prior art. And as most patent applications are prepared with counsel, that's a reasonable implication and a reasonable basis for the judge then to review the documents. So then we're back to what I said a minute ago, so that any time an applicant submits a declaration to the patent office attesting or not attesting to whether something's prior art or not, it's fair to infer that that was done with consultation with counsel. So again, I don't know where you draw the line. Well, I think that's for district judges to draw that line based on the facts and the situation that is presented to them. And I think it's for this court to say that that was an abuse of discretion. Now, in a different situation, the typical oath that's filed with a patent application wouldn't raise those implications. But district courts don't have unbridled discretion. No, Your Honor, I didn't mean to suggest that. But I was suggesting that Judge Jordan was aware of a lot of facts in this case and did try to draw the line very carefully. And even if this court were to draw it, that's where I'm asking you to help me because I don't know what the other facts were that might have suggested to Judge Jordan that this statement, seemingly innocent as it may be, somehow implicated some sort of brassler-type conduct. Well, I think you can look at the situation in which the declaration was submitted, which was an exculpatory declaration, an attempt to come in and tell the patent office, we should have disclosed this before, here are the facts. And I think that's different than a declaration filed with an application that says I'm aware of the obligation to submit material information. I think it was a fair implication that Judge Jordan made that this was done with the advice of counsel, especially when you can see it really comes down to a question, a fairly difficult legal question perhaps, as to whether or not this system was prior art. Because this becomes more than a simple discovery matter because the waiver of privilege resulted in certain documents, including the document Judge Dyke referred to earlier, with the marginal note about beef up the spec, that not only implicated the inequitable conduct issue, but also I think was significant with respect to written description. And as I understand it, if this ruling and the waiver was improper, that it certainly seemed to me to have a serious prejudicial effect with respect to the written description ruling. Well, just to address that, there is other evidence, and a lot of other evidence. But that's not the test. When evidence is erroneously admitted, the question is not whether there's other evidence that would support it, it's whether the prejudicial evidence, the erroneously admitted evidence, could have had an impact on the result. You certainly have to agree that this marginalia document could have been quite influential with the jury. I would agree that it could have. I would say that would be their burden on appeal to show that it did have that prejudicial effect in light of the wealth of other evidence that was presented. And that's where I was going, Your Honor, to say there is a lot of other evidence, and to show that it's prejudicial, that would be their burden on appeal. And they have to do that in the context of this record, which is pretty overwhelming on the written description issue. To say that that is what turned the tide, I think that's a burden that they can't meet. Judge, if you don't mind, I have a follow-up. We'll give you an extra couple of minutes since we took up some time, and we're going to restore some time with Mr. Rosen. Great. If we decide, though, on inequitable conduct, that Judge Jordan was right, then this waiver of privilege issue isn't so relevant. It's not. It doesn't have to be reached. Because while the waiver of privilege issue may go to written description, if we were to decide it on inequitable conduct, we don't have to reach that issue at all. And even if there was an inappropriate waiver, it wouldn't have affected inequitable conduct. That's true, Your Honor. Okay. And my next question to you was just about this waiver, particularly as these questions were asked. It was occurring to me that... I don't know. I think that in this case, were we to agree that there was a waiver, we'd have to say, based on your logic, and tell me where I'm going wrong, that there's a waiver every time you're attempting to cure inequitable conduct with an inventor declaration. I think it depends on what the statement says. Any time the inventor characterizes the prior art that he didn't disclose or something like that, I mean, doesn't that... That's my scary concern. I think that it may depend on how it's characterized. If it would say whether or not a piece of prior art had a particular technical feature, I'm not sure that there's an implication that that was formed with the advice of counsel. If there's a statement that says, I didn't think it was prior art, which is based on an understanding of what the law is as to what is prior art, there is a fair implication that the advice of counsel was given in drafting these declarations, as we know that the lawyers did help them draft them. That's no secret. And finally, I wouldn't... Just don't forget about the false statements in the declaration. I think that's our strongest argument, actually. Those statements that say the new rules were not included is really an outright false statement, and that could be the basis of the court's decision in the entire case. Okay. Thank you, Mr. James. Mr. Rosen. I appreciate having the rebuttal time restored. I'd just like to make a couple of points and then let's panelize other questions. I'll return it to the Treasury. Can I ask one question before you get going? Because counsel suggested not to forget about the misstatements, and I'm certainly very mindful of the misstatements. And I'll tell you, to the extent that they amount to inequitable conduct in the child patent, the child is therefore unenforceable. While I was going so much into this latent software, it was kind of my concern, because while you removed your challenge to infringement on the basis of the parent patent, Judge Jordan nevertheless rendered your parent patent unenforceable. And so I imagine that that is, since you have appealed his ruling with regard to inequitable conduct there, which he then said it affected the child, I imagine that we have to determine, don't we, whether that parent patent is unenforceable as part of this appeal. I don't think the court's judgment goes as far as rendering the patent unenforceable. That patent wasn't in front of the district court. He said inequitable conduct was committed in the course of this patent. It's very clear. Yes, but just strictly speaking, his judgment does not go so far as to touch that earlier patent. Clearly, the findings are what they are. I think it's important to keep in mind with respect to the declarations and these statements about the new rules that the same issue with respect to materiality applies there. No, see, that's not right, though. Under REFAC, we say any misrepresentation in a declaration is inherently material, and that ends the analysis. And if you're not familiar with the REFAC facts, which I'm sure you are, all the poor guy did there was leave out the fact that he happened to work for the employer at some point in time. Well, that's bad because it might have suggested bias on his part. He didn't misrepresent anything. The court found that was material, despite the fact that there were two other declarations that were completely unrelated in which there was no misrepresentation or omission at all. I mean, that seems far less offensive than what the gentleman did in this case. Well, one of the gentlemen did in this case. Your Honor, I think that you have to keep in mind that with respect to declarations, we're certainly mindful that when you voluntarily put in a declaration, you're almost acknowledging some degree of expectation that it's going to be relied upon. However, REFAC and cases following that, I don't think stand for the proposition that every statement in every declaration is material and, indeed, highly material. No, just every misstatement. Or every misstatement is material or highly material. I don't think the case is stateful. The Juicy Whip case we cited in our brief, I believe, specifically disclaims that. But what I think is important here is, and this is argued in our brief, so I obviously can't cover that now, is we don't believe there's a misrepresentation at initia in those declarations. Were the declarations cumbersome in the way they attached exhibits and referred to them? Absolutely. Can I ask you, though? Isn't it right that in the Juicy Whip case there were no misstatements at all in any of the two declarations that were filed, but rather the court held that the party in that case just didn't correct the examiner's apparent misunderstanding? That is correct, Your Honor. Okay. I just want to, in the couple of seconds left, take issue with one point Mr. Jakes made regarding Judge Jordan's findings. I don't think Judge Jordan said, I'm going off on the idea that even something that isn't prior art can be material, and that's why it doesn't matter to me whether it was used or not. I think Judge Jordan's findings are clear. He felt these states were disclosed and were in the prior art and could have negative novelty based on their mere residence on the super system. Thank you, Your Honor. Again, we've used up some of your time. If there's anything else you'd like to say before you sit down? No, thank you very much. I do appreciate getting the extra time. All right, Mr. Rosen, thank you. Mr. Jakes, thank you. Case is submitted.